UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MONET WILLIAMS et al., <br><br> Plaintiffs, <br><br> v. <br><br> WALTER V. WENDLER et al., <br><br> Defendants. | Case No. 05-cv-4157-JPG |

**MEMORANDUM AND ORDER**

**GILBERT, District Judge:**

**I.     Introduction**

On November 2, 2004, Chantel Conley, a student at Southern Illinois University (SIU) in Carbondale, Illinois, filed a police report with the SIU Department of Security.  She claimed Monet Williams, Tequeira Johnson, Nakia Collins (collectively, plaintiffs) and other members of the Zeta Phi Beta (Zetas) sorority hazed her on October 3, 2004 and October 6, 2004.  Among other things, she claimed the Zetas paddled her and her fellow pledges.  At Conley's request, the Department of Security forwarded the complaint to SIU's Office of Student Judicial Affairs.

Khamisi Grace, a hearing officer with the Office of Student Judicial Affairs (Office), charged plaintiffs with hazing.  Grace conducted a hearing and suspended Williams, Johnson, and Collins from the University for a period of three years.  The plaintiffs unsuccessfully appealed their suspensions at various levels.  SIU's Chancellor, defendant Walter Wendler, did, however, reduce Williams's punishment to a two-year suspension.  Plaintiffs claim defendants violated the equal protection clause of the Fourteenth Amendment and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, because they treated them harsher than similarly situated students of an unprotected class.

The defendants have moved for summary judgment on the two claims remaining in the complaint (Doc. 106). The plaintiffs have responded to this motion (Doc. 113), and the defendants have replied to their response (Doc. 138). Having reviewed the briefs and the record in this case, the Court is prepared to rule.

**II.     Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). In determining the existence of a genuine dispute of material fact, the Court construes all facts in the light most favorable to the nonmoving party and draws all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.

If the moving party meets its burden, the nonmoving party has the burden "to go beyond the pleadings and affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial." *Borello v. Allison*, 446 F.3d 742, 748 (7th Cir. 2006) (internal quotation marks and citations omitted); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *Insolia v. Phillip Morris Inc.*, 216

F.3d 596 (7th Cir. 2000).

### III.     Background

Plaintiffs base their assertions of disparate treatment on SIU's response to hazing incidents involving two white[1] fraternities: Pi Kappa Alpha (Pikes) and Delta Chi (D-Chi).

#### A.     Pikes

A young man pledging the Pikes in the spring of 2004 died while on a fraternity-related canoe trip with his pledge brothers and several members of the active chapter of the fraternity (the actives).[2]  Early in the morning of April 4, 2004, the decedent and a fellow pledge tipped their canoe during a late night jaunt into the lake.  One of them survived, but the other did not.  The decedent's autopsy showed he was drunk when he died.

The University and local authorities conducted investigations into the drowning.  The Jackson County State's Attorney Office charged one of the actives on the trip, Bjorn Westlund, with unlawfully providing alcohol to the decedent before his death.  Westlund, who is white, pleaded guilty and paid a fine.[3]

---

[1] Plaintiffs have not articulated their theory of liability consistently or precisely. Sometimes, it appears they argue they received disparate treatment based on their membership in a historically, or predominantly, black Greek organization.  At other times, they appear to argue that they were treated adversely because they are black.  If the former is their theory, they cannot state a claim under Title VI because the basis of their claims would not be their race itself, but their membership in an organization.

[2] Plaintiffs have apparently marshaled the facts of the Pikes incident from various reports in the campus newspaper, the *Daily Egyptian*.  The facts remain unclear because SIU did not take any disciplinary action against individual members of the fraternity.

[3] Plaintiffs have not established the race of any member of the Pikes other than Westlund.  While they contend that "Pikes are an historically white fraternity," they have offered no evidence from which it is reasonable to conclude that the Pikes do not allow non-white individuals to join their fraternity.

SIU's Student Development Office also investigated the incident. Its Director, Katherine Sermersheim, conducted a hearing into the events leading up to the pledge's death. Among others, she interviewed the Pikes' president and several of its actives. She found that individual members of the fraternity gave suspiciously diverging accounts of the events surrounding the pledge's death, and determined that the Pikes as a whole violated SIU's alcohol use, hazing, and risk management policies. For this reason, she banned the fraternity from campus permanently.[4]

The Office did not conduct an investigation into the conduct of any individual member of the Pikes, and thus no Pike other than Westlund received any punishment for his involvement in the events leading to the pledge's death.

### B.     D-Chi

In the fall of 1998, four D-Chi pledges stripped a fellow pledge naked, duct-taped him to a tree, and covered him with mud and ketchup. The pledges doing the stripping, taping, and covering were friends with the pledge who was stripped, taped, and covered. For this reason, the pledge did not complain to the University. Unfortunately for those doing the hazing, the campus police caught them in the act and initiated disciplinary proceedings with the Office.

After a hearing, the Office found that the pledges violated the University's hazing policies. The individuals involved – all white males – received one-year suspensions from the University, though at least one had his suspension reduced to probation on appeal.

## IV.    Analysis

### A.     Nature of the Claim

Plaintiffs claim their respective punishments "far outstrip[] what the Pikes received, or

---

[4] This was the first time a Greek organization had been banned from campus permanently.

what any white fraternity or sorority member has ever received as punishment for hazing or related acts." (Doc. 113 at 2). Because the result of the hazing in the Pikes incident was unquestionably more serious than the result in Ms. Conley's case, the plaintiffs feel that the Office's failure to take any action against individual members of the fraternity can only be attributed to race-based special treatment. Respecting the D-Chis, since "the Defendants literally have not presented any evidence that the students involved in the Delta Chi incident were ever actually suspended," plaintiffs contend the Court must conclude the D-Chi pledges got off scot-free as well. Plaintiffs believe the only explanation for the differing punishments received by the Pikes, D-Chis, and Zetas is the race of the individuals involved.

Defendants argue that plaintiffs' case must fail in light of the undisputed fact that SIU has suspended white students for hazing. More specifically, defendants argue that the Pikes incident is not worthy of serious consideration here because the plaintiffs have not shown that the pledge's death resulted from hazing, that defendant Huffman (the Director of the Office) knew the identity of the individual Pikes involved in the drowning, or that Huffman failed to institute proceedings against them because they are white. Defendants also circuitously argue that the individuals involved in the Pikes incident are not similarly situated to the plaintiffs, on the ground that no individual actually filed a complaint against them with the Office.

      B.    Title VI

Title VI prohibits "discrimination under any program or activity receiving Federal financial assistance" based on "race, color, or national origin." 42 U.S.C. § 2000d; *Brewer v. Bd. of Trs. of Univ. of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007). To make their case under this statute, the plaintiffs have chosen the indirect, burden-shifting method adapted from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brewer*, 479 F.3d at 915.

To meet their initial burden under the indirect method, the plaintiffs must show that they are members of a protected class, that they were meeting SIU's legitimate educational expectations, that they suffered an adverse educational action, and that they suffered "worse treatment than . . . similarly situated students not in the protected class." *Id*. at 921. If the plaintiffs meet their prima facie case, the burden shifts to the defendants to offer a legitimate, nondiscriminatory reason for their actions. *Id*. at 915. If defendants meet this burden, the burden shifts to the plaintiffs to show that defendants' reason "is mere pretext for discrimination." *Id*.

Plaintiffs have met the first three elements of their prima facie case. They are black, they were meeting SIU's legitimate educational expectations at the time of their suspension, and they suffered an adverse educational action. The dispute in this case is whether the plaintiffs have shown that they received harsher punishments than similarly situated members of an unprotected class.

The parties have not cited any case establishing what it means to be similarly situated in this context. Reason suggests, however, that "similarly situated" here means what it means elsewhere: "directly comparable . . . in all material respects." *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002); *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 564 (7th Cir. 2000) (finding that the plaintiff failed to meet her prima facie case because she did not show that she was "otherwise similarly situated to other nutritionists or intake clerks who are members of an unprotected class."). Drawing from the factors relevant in the employment cases,[5] the Court finds that the factors pertinent here include the nature of the

---

[5] In employment discrimination cases, courts look at all relevant factors, which usually include whether the employees "dealt with the same supervisor," were "subject to

hazing[6], the result of the hazing, the position of the individual doing the hazing within the organization, and that nature of the complaint that spawned the University's response.

Though the defendants have only hit at the issue tangentially, the Court finds that the plaintiffs have failed to show that the Pikes involved in the pledge's death are similarly situated members of an unprotected class for purposes of an appropriate comparison to the plaintiffs. Because Westlund is the only individual the plaintiffs have identified by name and race, he is the only individual the Court can rightly consider in the final analysis. There is no indication that Westlund held a position of authority within his fraternity, unlike Collins, who was the president of the undergraduate chapter of the Zetas, and unlike Johnson, who was the vice president of the undergraduate chapter. There is also no indication that Westlund was a graduate student, like Williams was. More important, the nature of the hazing in the two cases was qualitatively dissimilar. The only information before the Court is that Westlund purchased beer for the pledge (or otherwise provided alcohol to him). Even assuming that providing beer to the pledge was hazing, physically striking a pledge with a paddle is most certainly different.

---

the same standards," and had "comparable experience, education and qualifications," so long as the employer took account of the factors when making the action in question. *Patterson*, 281 F.3d at 680 (internal quotation marks omitted); *see also Ajayi v. Aramark Business Servs.*, 336 F.3d 520, 532 (7th Cir. 2003).

[6] Plaintiffs devote little effort in arguing that they did not haze Ms. Conley. Because the point is disputed, it is possible they did not make substantial arguments in this regard due to the fact that the question is clearly for a jury. On the other hand, if the hazing did not occur, then it appears that they have offered no evidence of similarly situated members of an unprotected class being treated differently. To make this showing, they would have had to introduce evidence that a pledge or other individual filed a complaint against a similarly situated member of an unprotected class with the Office and that the individual did not get punished by the Office. They have offered no evidence of this sort. While such information might be significant if the plaintiffs were proceeding under the direct method, they are not.

The Pikes incident and the Zetas incident are also different because no one filed a complaint with the Office regarding the Pikes incident. While the Court must accept plaintiffs' assertion that any member of the University community can file a complaint with the Office, it must also accept Terry Huffman's[7] uncontradicted assertion that "the Office does not have the authority to, of its own accord, initiate investigations into potential acts of student misconduct, including hazing, without a formal complaint first being filed with the Office." (Huff. Aff. at 2). That Huffman had the power to file a complaint with the Office in his individual capacity – leaving aside the question of whether it would have been appropriate for him to do so given that he learned about the incident from the campus newspaper – does not change the fact that neither he nor anyone else filed a complaint with Office regarding the pledge's death.

The D-Chi incident is also meaningfully dissimilar from the Zetas incident. While stripping a pledge naked, tying him to a tree, and covering him with filth is functionally indistinguishable from paddling or forcing a pledge to knee-dive into rice grains, other components of the incident make it quite different. First, the hazors and the hazee in the D-Chi incident were pledge brothers, which means the power dynamics in the Zetas incident – hazing by the president, vice president, and a graduate student – were not present. Second, the hazee was friends with the hazors. Finally, the pledge did not file a complaint with the Office, the campus police did. These three facts show that the hazors in the D-Chi incident were not similarly situated to the plaintiffs.

The plaintiffs have not shown that similarly situated members of an unprotected class

---

[7] Huffman is currently the Director of the Office. He has held that position since December 2006. Before becoming Director, he was the Coordinator of the Office for 12 years. (Huff. Aff. at 1-2).

received disparate treatment. Thus, plaintiffs have not met their prima facie case with respect to Title VI, and, by extension, § 1983. *Burks v. Wisc. Dept. of Transp.*, 464 F.3d 744, 750 (7th Cir. 2006).

**V.      Conclusion**

The Court **GRANTS** Defendants' motion for summary judgment, **DISMISSES** this case **WITH PREJUDICE**, and **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATED: August 23, 2007**

                                           s/ J. Phil Gilbert
                                           **J. PHIL GILBERT**
                                           **DISTRICT JUDGE**